**Abe B. and Leona M. ADLER, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 19190.**

United States Court of Appeals, Sixth Circuit.
Feb. 20, 1970.

---

appellee; Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson, Elmer J. Kelsey, Attys., Dept. of Justice, Washington, D. C., on the brief.

Before EDWARDS and CELEBREZZE, Circuit Judges, and HOGAN,* District Judge.

HOGAN, District Judge.

This is an appeal by Abe and Leona Adler from that portion of a judgment which was entered on a conclusory finding of fact that "at least a part of the deficiency or underpayment of tax by the Adlers for each of the years 1950 through 1958 was due to fraud with intent to evade tax, and each of their federal income tax returns for those years was a false and fraudulent return with intent to evade tax."

The sole question is whether that finding was "clearly erroneous"—whether "although there is evidence to support it," this Court "on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). A careful review of the entire record leads this Court to no such conviction and we therefore affirm. There was substantial evidence to support the conclusion by the Tax Court that the Commissioner had established (by clear and convincing evidence, Fuller v. C. I. R., 313 F.2d 73 [6th Cir. 1963]) that with respect to each of the calendar years, 1950 through 1958, a "part of the underpayment of tax required to be shown on the return" of the petitioners was "due to fraud"; that the substantive requirements of Section 6653 of the Internal Revenue Code of 1954 (and its 1939 predecessor) and the burden of proof requirement of Section 7454 of the 1954 Code (and its 1939 predecessor) had been met.

The appellants are husband and wife, who are now in their 70's. Their formal education ended in the eighth and sixth

James C. Herndon, Akron, Ohio, for petitioners-appellants.

Stephen H. Hutzelman, Dept. of Justice, Washington, D. C., for respondent-

---

* Honorable Timothy. S. Hogan, United States District Judge for the Southern District of Ohio, sitting by designation.

grades respectively and neither has had any formal training in bookkeeping. In the 30's they started a furniture business in Youngstown and at least up until 1962, including all the years involved here, they owned and operated a retail furniture store—with marked success. During the years involved they employed a full-time or part-time furniture finisher, a part-time office girl, and a cleaning girl, who cleaned the store once a week. The Adlers worked on a full-time basis. The husband devoted his time to the handling of purchases, deliveries and inventory; the wife managed the store and waited on customers. At least until June 8, 1959, (when the examination began which led to this case) and for some time thereafter, the record keeping (which was primarily Leona's responsibility, except for the check book) was single entry and, to say the least, unsophisticated. The pre-1955—as well as most of the 1955—records were destroyed for diverse reasons long prior to June of 1959. The Tax Court was satisfied with the good faith of the explanations tendered for the destruction and did not consider such significant to the ultimate question, so the detail need not be recounted. For instance, years before June of 1959, calendar 1953 seems to have been examined by the appellee without significant change.

Despite the lack of sophistication in the record keeping, the Tax Court found that the records—available for the years 1956 through 1958—were adequate and constituted an "accrual method." There is no controversy that in some fashion or another, in respect of the years 1956 through 1958, the financial transactions of the business were in fact recorded. Nor is there any question that, even though the 1950–1955 records were not available, the method was the same. It is therefore not necessary to refer in detail to the various records that were kept. Generality, in the areas involved in this case, will suffice.

The income of the taxpayers for each of the nine years involved was reconstructed by the appellee on a bank deposits-expenditures method. For all practical purposes (with certain minor exceptions, which will be hereinafter referred to) the variants between the income as reported and the income as reconstructed are attributable to the receipts and expenditures arising from the furniture business. The taxpayers' regularly employed accountant, in what the Tax Court describes as a "conscientious tax consuming effort" and using a double entry system based on the 1956–1958 records, determined the correct reportable income for those years, as distinguished from that actually reported. His determinations and the determinations of the Commissioner, based on the bank deposits-expenditures reconstruction method, differed but little. There was little, if any, contest below, and there is no question at all here that the income reported by the taxpayers on their tax returns for the nine years aggregated approximately $149,000.00; that the actual income which should have been reported for the nine-year period exceeded $310,000.00 and that the amount of understatement for the nine-year period exceeded $161,000.00. The breakdown is as follows:

| Year | Reported Income | Understatement |
|---|---|---|
| 1950 | $ 15,122.84 | $ 21,224.38 |
| 1951 | 17,561.74 | 24,346.23 |
| 1952 | 13,034.63 | 12,904.42 |
| 1953 | 18,056.05 | 8,661.42 |
| 1954 | 17,731.99 | 14,075.39 |
| 1955 | 17,939.90 | 15,131.25 |
| 1956 | 18,317.51 | 17,044.00 |
| 1957 | 20,356.60 | 26,161.03 |
| 1958 | 11,636.00 | 22,197.58 |
| TOTAL | $149,757.26 | $161,745.70 |

Introductory to a reference to the evidence on which the Tax Court based its particular conclusion attacked here, it should be noted that the question before the Tax Court arose in an unusually complex situation, and the complexity was dealt with carefully and comprehensively by the Tax Court in a 58-page opinion. At issue there was whether or not the taxpayers' method of accounting was cash or accrual. The decision on that issue favored the taxpayer, as well as on the issue of whether or not in 1959 the accounting system had been changed without the Commissioner's consent. At issue was the correct determination of the amount of "cash expenditures for business receipts" for each of the years 1950 through 1954—and on that issue, involving substantial amounts, the taxpayers prevailed. In 1953, as a result of an examination requested by the taxpayers, an $11,000.00 sales tax deficiency was levied by the State of Ohio and paid by the taxpayers—the calendar year or years appropriate for that deduction was at issue below and decided favorably to the taxpayers. The Commissioner, although the 90-day deficiency letter issued November 30, 1965, was based on the bank deposits-expenditures method, attempted to introduce into the Tax Court proceedings a net worth computation both for substantive purposes (it would have increased the deficiency) and for evidentiary purposes, as bearing on the intent of the taxpayers. The Court rejected it for the former purpose and limited it to the latter and, furthermore, in respect of at least two years, the judgment is less than that warranted by the established understatement of income due to the fact that the lesser figure was contained in the deficiency letter. It should be noted, however, in respect of the net worth computation, that there is no question in this record that it differs but little in conclusion from the understatement figures referred to above.

■ The Tax Court's conclusion was based predominantly on this:

"The consistent pattern of substantial understatements in each and every year for nine consecutive years clearly shows the scienter—the intent to evade tax. Where, as here, large amounts of income are consistently and repeatedly omitted from tax returns, and the explanation for such omissions is patently weak or incredible, then the conclusion is inescapable that the taxpayers intended to understate their true income."

That is a correct statement of the law and differs but little from this Court's statement in *Rogers v. Commissioner of Internal Revenue*, C.C.A., 111 F.2d 987 (1940):

"It is conceivable that taxpayers may make minor errors in their tax returns, or, owing to different or contradictory theories of tax computation, calculate returns which differ greatly in result from the Commissioner's assessments. Here petitioners do not have that excuse. Discrepancies of 100% and more between the real net income and the reported income for three successive years strongly evidence an intent to defraud the Government."

See also Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954); and Kurnick v. Commissioner, 232 F.2d 678 (6th Cir. 1956). In the *Kurnick* case this Court said:

"While fraud is never presumed but must be established by clear and convincing evidence and there must be an intention to defraud, * * * we think this burden is clearly sustained by the discrepancies between real net income and reported income for so many years. Consistent, substantial understatement of income for several years, as was true here (7 years), is highly persuasive evidence of intent to defraud the government."

The appellants vigorously assert that "the mere understatement of income over a period of years is not sufficient in and of itself to show fraud by clear and convincing evidence," relying on Jo-

seph Kendzie T. C. Memo 1968–174 (and cases cited therein). We do not reach that question on this record since the Court below, as the primary reason for its conclusion, relied not only on the consistent understatements but also on the "patently weak or incredible explanation for such omissions"—the appellants concede that the presence of the latter, coupled with the former, is sufficient basis for a fraud finding.

We turn therefore to the "explanations." The calendar year understatements vary from a low of $8,600.00 to a high of $26,000.00 and average something in excess of $17,000.00 a year. The taxpayers did not choose to remain silent. Even assuming that by so doing a Fifth Amendment question might have arisen, there is no such question here. Cf. United States v. Dolleris, 408 F.2d 918 (6th Cir. 1969); Hayes v. United States, 407 F.2d 189 (5th Cir. 1969); United States v. Kleckner, 273 F.Supp. 251 (S.D.Ohio, 1967). The taxpayers and their witnesses testified and advanced three "explanations" which cumulatively would approximately represent the understatements.

First—in their record-keeping methods the appellant Leona, at the end of each calendar year, prepared a schedule of their total sales which she turned over to their accountant; she added all unpaid sales invoices dated in that year, which had been placed in one file drawer on delivery of the merchandise, and all paid sales invoices dated in that year, which had been placed in a second file drawer. The sum thereof represented total sales for the year. In their process of invoice keeping, there were separated at the end of the year invoices dated in that year where the merchandise was not delivered at the end of that year. This procedure had the effect of excluding from the total sales for any particular year all sales invoices dated in one year where the merchandise was delivered in a subsequent and taxable year. This explanation was buttressed by the production of a tape on which had been added invoices for sale purposes for the year 1957. There were no tapes available for any other year, but the system was the same. The 1957 tape did omit that type of invoice. The gross sales during the years 1950 through 1958 averaged in excess of $170,000.00 per year; 60% of these involved sales in which it was necessary to order the merchandise from the manufacturers. The net result of the omission for the three determinable years, 1956, 1957 and 1958, was an understatement of $11,000, $17,000 and $11,000 respectively—a very substantial part of the entire understatement.

The second explanation offered was this. In the course of their business, the appellants sold carpeting and in numerous instances the sale contract provided that the sellers would install the carpeting. When an invoice covering such a transaction was made out by the appellant Leona, she would deduct on the face of the invoice the amount to be paid by the appellants to some outsider for that installation; when the installation was paid, it was paid for by check from the checkbook. In gathering together their figures to turn over to the accountant for the preparation of their tax returns, the carpet installation items were therefore deducted twice, both in the tabulation of gross sales and in the tabulation of business expenses paid. In the three determinable years of 1956, 1957 and 1958, this double deducting amounted to $3,500, $3,700 and $2,800 respectively.

The third, in brief, amounts to this. On the invoice involving a particular person a number of transactions would appear, such as additional sales charges, credits and adjustments, etc.; in the transposition from the invoice to the tape, only the main transaction was transferred—for instance, if a customer bought one item of furniture in January and another item in February, the February transaction in a number of instances was entered in a subsidiary fashion on the January invoice. There are 150 such involved in the invoices for the three available years and the understatements resulting therefrom amounted to approximately $7,000, $7,000 and $5,000. In fairness, it is noted that as the result of similar confusion in record-

ing, expenses for the two years, 1956 and 1957, were understated by approximately $10,000 in the aggregate, and overstated by approximately $1,600 for 1958. Be that as it may, the explanations advanced by the appellants, in the aggregate of the three, pretty well account for the actual understatement in the respective years. The appellants urge that the uncontradicted "explanations" required a finding of fact below not only that such did in fact happen, but also that it occurred in good faith. The Tax Court, not as a formal finding but in the course of its opinion, was apparently satisfied that the explanations mathematically accounted for the differences. However, the question remained for that Court as a question of fact whether the explanations demonstrated that the understatement resulted from the taxpayers' "lack of education and inexperience" or whether the omissions were intentional and fraudulent. The Court below found the latter to be the case as a fact and there was ample evidence to support that conclusion. The petitioners were not inept in operating their furniture business. It was a very profitable business, netting over a nine-year period, before taxes, something in excess of $30,000.00 a year. The appellants were not inept in recording and accounting for expenses and deductions, with the exception noted above. Expenses were carefully recorded, classified into deductible categories and verified against the Day Books. Cash transactions were meticulously recorded. With respect to the explanation involving the year-end invoices, two things are noteworthy. First, the charge for the undelivered merchandise, i. e., the account payable to the manufacturer, was in every case actually recorded and actually taken as a cost of goods. For one who meticulously recalls, at income tax time, and makes deductions of approximately $8,000.00 per year for costs of goods, the explanation of "forgetting" $3,000.00 in gross profit is "patently weak." This is not a case in which a simple and uneducated taxpayer, perhaps unconsciously in an accrual system, neglected to include profit in the right year—it is a case in which taxpayers, capable of operating a highly successful business, "forgot" over a nine-year period to put an approximate aggregate of $25- or $30,000 in profit in any year. The credibility of the appellants was peculiarly for the Tax Court's determination and the "inferences from the facts" were also peculiarly for the Tax Court. Commissioner v. Duberstein, supra.

The second "explanation" is also "patently weak or incredible." While the sales records were kept by one of the appellants and the check book was kept by the other, they were not strangers. It is inconceivable that taxpayers who, in 1953, were sufficiently conscious of business matters to transfer $50,000 from a checking account to a savings account, and who, over the five-year period, 1953 to 1958, similarly transferred an aggregate of $212,000, did not at some time become mutually conscious of the fact that the same $3,000 a year deduction was being doubled. We cannot accept appellants' argument that the three major deficiencies in tax reporting were attributable to their ignorance or negligence, or lack of education. Cf. Webb v. Commissioner, 394 F.2d 366 (5th Cir. 1968). Prior to the years in question here the appellants had acquired sufficient sophistication to have investments such as in horses, in U. S. bonds, in stocks, in postal savings notes, and in real estate. Furthermore, as this record establishes beyond cavil, the annual increases in the net worth of the appellants were completely inconsistent with their tax returns—at least $15,000 a year on the average (since there is no controversy that the net worth statement closely approximated the understatement set forth above).

■ We agree with the conclusion of the Tax Court that the explanations for the omissions dealt with above were "patently weak and incredible." We cannot say that the findings of the Tax Court are "clearly erroneous." It is therefore unnecessary to deal with appellants' contentions that the Court below rested its conclusions on other grounds in error. The opinion of the Court below does deal

with (a) the omissions of interest income from 1953 through 1958, which were relatively minor in the early years and relatively major in the latter years; (b) the omission from the tax returns of dividend income (this was minor and referred only to the latter years); and (c) the claimed conduct of the appellants after the investigation had been initiated by the Commissioner in 1959. In respect of the latter, the Tax Court found that at the initiation of the investigation on June 8, 1959, the appellants disclosed only one safe deposit box, whereas they had two. The finding of fact on that score is amply supported by the record:

> "Q. Did you 'the agent' ask Mr. and Mrs. Adler where they had safe deposit boxes, if any?
>
> A. Yes, I did.
>
> Q. And what was their response?
>
> A. They said they had one safe deposit box."

More significant is the fact that on the same day, and shortly after noon, the wife entered the "other box" for purposes not disclosed in any way on this record.

The judgment of the Tax Court is, therefore, affirmed.