BEN H. LOGAN and JEANNE E. LOGAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Logan v. Commissioner
Docket Nos. 3959-68, 3657-72.
United States Tax Court
T.C. Memo 1976-143; 1976 Tax Ct. Memo LEXIS 260; 35 T.C.M. (CCH) 646; T.C.M. (RIA) 760143; May 6, 1976, Filed Benjamin H. Logan, II, for the petitioners. Juandell D. Glass, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes and additions to tax under section 6653(b) [1] as indicated: Addition
to tax
Year
Income tax
(Sec. 6653(b))
1955
$ 6,065.08
$ 3,032.54
1956
5,293.74
2,646.87
1957
8,052.43
4,026.22
1958
6,082.72
3,041.36
1959
6,327.41
3,163.71
1960
5,7 48.10
2,874.05
1961
9,013.25
4,506.63
1962
14,020.99
7,010.50
1963
9,730.27
4,865.13
1964
11,949.86
5,974.93
The issues for decision are: (1) Whether petitioners understated their taxable income during the years in issue, as determined by respondent using the net worth method of reconstructing income; and (2) Whether petitioners committed *262 fraud in connection with reporting their tax for those years. The latter issue relates both to the additions to tax and to the applicability of the section 6501(c)(1) exception to the statute of limitations on assessment and collection. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulations of fact, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners are husband and wife and resided in Dayton, Ohio, at the time the petitions herein were filed. They filed joint Federal income tax returns for the years 1955 through 1964 with the district director of internal revenue, Cincinnati, Ohio. During some or all of the years in issue, petitioners were engaged in numerous enterprises *263 in and around Dayton, including the operation of restaurant, night club, tavern, coin machine, and hotel-motel businesses: they also owned rental real property. They began operating a single hamburger stand in the late 1940's, and by 1964 had acquired numerous business locations of various types. Petitioner Ben Logan actively controlled all of the businesses, devoting virtually all of his time to supervising their operations. He collected the receipts and handled all of the banking for the businesses. He alone had the authority to sign checks. Mrs. Logan was generally responsible for collecting the rents from the rental property. Petitioners employed various bookkeepers and accountants, who maintained some records of receipts and expenditures and prepared income tax returns from information furnished to them by petitioners. Petitioners' principal sources of income were sales of food and drink, receipts from coin vending and amusement machines, and rents. They also had interest income from savings bank accounts. Each place of business had one or more cash registers which recorded sales on paper tapes. These tapes were collected at the end of each shift and the contents *264 of the registers verified by Ben Logan or by a person employed for that purpose. The tapes were given to the accountant or bookkeeper, who made entries in the books. Cash was collected periodically from coin operated machines at these locations but was not reflected on the register tapes. Ordinarily, no record of these cash collections was supplied to the accountant or bookkeeper. When the accountant inquired about such receipts, for example, when he was preparing petitioners' tax returns, Ben Logan supplied him with an "estimated" figure. Real estate rentals were not recorded by the accountant or bookkeeper. Any information requested by the accountant or bookkeeper regarding rentals was provided by Ben or Mrs. Logan. Petitioners' assets, with the indicated values at cost on December 31 of each year, consisted of the following: 1954
1955
1956
1957
Cash
$ 3,000.00
$ 3,000.00
$ 3,000.00
$ 3,000.00
Checking and
savings accounts
12,627.71
11,725.13
10,652.48
9,714.45
U.S. savings
bond
18.75
18.75
Automobiles 3,000.00
3,000.00
3,000.00
4,834.00
20,839. 18
Inventory
1,571.82
1,712.22
1,939.11
4,109.20
Furniture, fix-
tures and equip-
ment
26,658.00
26,658.00
26,658.00
54,000.00
Church bond
Account receiv-
able
Mortgage re-
ceivable
Real estate: (before depreciation)
Land and
buildings
40,300.00
48,300.00
95,300.00
102,300.00
Improvements
17,000.00
17,000.00
17,000.00
17,000.00
Stock
9,000.00
Total assets
$ 104,157.53
$ 111,395.35
$ 157,568.34
$ 203,976.40
*265 1958
1959
1960
1961
Cash
$ 3,000.00
$ 3,000.00
$ 3,000.00
$ 3,000.00
Checking and
savings accounts
9,602.54
6,991.72
8,629.26
16,607.13
U.S. savings
bond
18.75
18.75
18.75
18.75
Automobiles 4,834.00
8,649.10
8,649.10
8,649.10
20,839. 18
Inventory
3,370.29
1,850.00
2,570.15
2,007.40
Furniture, fix-
tures and equip-
ment
54,000.00
59,558.30
61,569.05
63,169.05
Church bond
500.00
500.00
Account receiv-
able
Mortgage re-
ceivable
Real estate: (before depreciation)
Land and
buildings
102,300.00
99,350.00
99,350.00
99,350.00
Improvements
17,000.00
17,000.00
17,000.00
17,000.00
Stock
9,000.00
9,000.00
9,000.00
9,000.00
Total assets
$ 203,125.58
$ 205,417.87
$ 210,286.31
$ 220,649.53
1962
1963
1964
Cash
$ 3,000.00
$ 3,000.00
$ 3,000.00
Checking and
savings accounts
18,691.52
19,970.22
12,957.37
U.S. savings
bond
18.75
18.75
18.75
Automobiles 9,997.20
13,822.20
18,145.44
20,839. 18
Inventory
3,509.99
4,085.04
4,661.46
Furniture, fix-
tures and equip-
ment
74,968.17
83,940.03
91,921.44
Church bond
500.00
500.00
500.00
Account receiv-
able
500.00
Mortgage re-
ceivable
6,723.50
Real estate: (before depreciation)
Land and
buildings
110,130.00
131 ,630.00
216,630.00
Improvements
17,000.00
23,117.45 [1]
15,748.24
Stock
9,000.00
9,000.00
9,000.00
Total assets
$ 257,864.13
$ 293,406.93
$ 375,276.44
*266 On December 31 of each year, petitioners had liabilities, consisting of mortgages and notes payable outstanding, in the following amounts: 1954
$ 3,500.00
1955
2,500.00
1956
40,600.00
1957
40,004.76
1958
18,955.27
1959
12,731.22
1960
3,988.80
1961
0
1962
14,474.19
1963
30,653.74
1964
88,389.81
Petitioners are entitled to a depreciation reserve on the following assets and computed on the bases indicated: Nondepre-
Total
ciable
Date
Life
Sec.
Disposed
179
cost
cost [1]
acq.
(yr.)
Method
elected
of
Real Property: 307-11 Woodward
$ 4,500.00
$ 540.00
4/46
20
S/L
1218 W. 5th
5,000.00
3,400.00
3/48
20
S/L
18-20 Calm
5,000.00
2,050.00
6/50
20
S/L
1959
1312 Germantown
8,000.00
4,923.00
5/55
20
S/L
708-12 W. 5th
12,000.00
2,368.00
1/56
20
S/L
355-7 W. 5th
10,000.00
3,465.00
11/49
20
S/L
1964
2713-9 Jerome
1,800.00
342.00
11/52
20
S/L
1104 S.
7,000.00
1,096.00
9/57
20
S/L
Broadway
1300-8 W. 5th
35,000.00
2,980.00
12/56
20
S/L
5080 Germantown
9,500.00
3,020.00
10/62
20
150%DB
1100 S.
12,000.00
2,718.00
5/63
20
150%DB
Broadway
1354 W. 5th
9,500.00
937.00
10/63
20
S/L
3225 Home
80,287.43 [2]
4,172.50
3/64
33 1/3
200%DB
705 Eleanor
7,105.00
2,267.00
6/51
20
S/L
Improvements: 3225 Home
9,630.79
0
11/64
10
200%DB
355-7 w. 5th
17,000.00
0
6/53
16 [3]
S/L
1964
Other
2,340.00
0
11/63
10
200%DB
Other
3,777.45
0
3/63
10
200%DB
Furniture,
fixtures
and equipment: Motel
10,717.53
7/64
10/200
yes
%DB
Restaurant
26,658.00
various
20
S/L
no
(Thru 1956)
Restaurant
54,000.00
various
10
S/L
no
(1957 thru
1961)
Restaurant
48,000.00
various
10
S/L
no
(1962 and 1963)
Restaurant
43,000.00
various
10
S/L
no
(1964)
Restaurant
948.87
7/63
10
200%DB
yes
Restaura nt
340.00
34.00
12/64
10
S/L
yes
Restaurant
817.71
12/64
10
200%DB
yes
Other
957.99
12/63
10
200%DB
yes
Bar (1100 S.
5,558.30
0
1/59
10
S/L
no
Broadway)
Club (3400
13,618.45
0
1/62
10
S/L
no
Delphos)
Wurlitzer
1,600.00
160.00
12/61
5
S/L
no
1962 (1)
phonographs (3)
Wurlitzer
650.00
2/63
10
200%DB
yes
phonographs (3)
Wurlitzer
1,170.00
3/63
10
200%DB
yes
phonographs
Wurlitzer
1,100.00
7/63
10
200%DB
yes
phonographs
Bowling
3,400.00
1/62
10
200%DB
no
machines
Bowling
1,355.00
1/63
10
200%DB
no
machines
Cigarette
2,790.00
1/63
10
200%DB
yes
machines
Beauty Shop
1,083.75
108.00
1/61
10
S/L
no
Amusement
1,106.17
7/64
10
200%DB
yes
Cash register
1,314.00
131.00
1/62
10
S/L
no
Other
927.00
92.70
1/60
10
S/L
no
Automobiles: 1951 Oldsmobile
3,000.00
2,000.00
1951
3
S/L
no
1957
1954 Chevrolet
250.00
0
6/57
3
S/L
no
1964
panel truck
1957 Mercury
4,584.00
3,042.00
6/57
3
S/L
no
1959
hardtop
1959 Mercury
4,796.10
3,148.00
3/59
3
S/L
no
1961
convertible
1959 Mercury
3,528.00
2,264.00
8/59
3
S/L
no
hardtop
1951 Chevrolet
75.00
0
11/59
3
S/L
no
1962
1961 Cadillac
6,144.20
5,315.00
5/61
3
S/L
no
1963
convertible
1962 Ford
3,900.00
2,700.00
7/62
3
S/L
no
Thunderbird
1964 Cadillac
6,999.70
6,099.70
11/63
3
S/L
no
convertible
1965 Plymouth
2,943.74
1,972.00
10/64
3
S/L
no
station wagon
*267 Petitioners have stipulated that they made nondeductible personal expenditures in each year in the following amounts: 1955
$ 7,849.69
1956
8,000.00
1957
9,500.00
1958
8,500.00
1959
11,500.00
1960
12,000.00
1961
13,500.00
1962
13,500.00
1963
15,000.00
1964
15,000.00
The following amounts of deductible personal expenditures are stipulated: Automobile
Real estate
sales taxes [1]
Contributions
taxes
1955
$ 146.13
$ 128.96
1956
1957
383.19
1958
190.46
1959
227.99
1960
260.66
1961
182.50
$ 275.00
225.98
1962
113.42
173.00
236.26
A Wurlitzer phonograph purchased in 1961 was destroyed by fire in 1962. Petitioners received $ 25,838.82 in 1964 on the involuntary conversion of the property at 355 W. 5th, known as Ben's Hotel. This sum was reinvested in qualified property, resulting in a nonrecognized gain of $ 14,712.57, after taking into account the *268 increase in cost basis (see pp. 16-17, infra.)
Petitioners are entitled to personal exemptions totalling $ 2,400.00 in each of the years from 1955 through 1962; $ 3,000.00 in 1963; and $ 1,800.00 in 1964. They are also entitled to investment tax credits of $ 1,283.27, $ 494.55, and $ 908.70 in 1962, 1963, and 1964, respectively. By way of summary, the computation of petitioners' increase in net worth, their taxable income, and other related items is as follows: 1954
1955
1956
1957
Total assets
$ 104,157.53
$ 111,395.35
$ 157,568.34
$ 203,976.40
Less: Liabilities: mortgages and
notes payable
3,500.00
2,500.00
40,600.00
40,004.76
Reserve for
depreciation
16,390.43
19,955.45
24,186.77
33,399.78
Net Worth
84,267.10
88,939.90
92,781.57
130,571.86
Increase
4,672.80
3,841.67
37,790.29
Add:
nondeductible
personal expenses
7,849.69
8,000.00
9,500.00
Less:
nonrecognized
capital gain
Exemptions
(2,400.00)
(2,400.00)
(2,400.00)
Taxable income: Corrected
10,122.49
9,441.67
44,890.29
Reported
5,101.56
4,774.99
0
Unreported
5,020.93
4,666.68
44,890.29
1958
1959
1960
1961
Total assets
$ 203,125.58
$ 205,417.87
$ 210,286.31
$ 220,649.53
Less: Liabilities: mortgages and
notes payable
18,955.27
12,731.22
3,988.80
0
Reserve for
depreciation
44,058.31
53,171.14
64,748.16
75,052.25
Net Worth
140,112.00
139,515.51
141,5 49.35
145,597.28
Increase
9,540.14
(596.49)
2,033.84
4,047.93
Add:
nondeductible
personal expenses
8,500.00
11,500.00
12,000.00
13,500.00
Less:
nonrecognized
capital gain
Exemptions
(2,400.00)
(2,400.00)
(2,400.00)
(2,400.00)
Taxable income: Corrected
15,640.14
8,503.51
11,633.84
15,147.93
Reported
910.01
(12,660.28)
(12,144.56)
1,706.38
Unreported
14,730.13
21,163.79
23,778.40
13,441.55
*269 1962
1963
1964
Total assets
$ 257,864.13
$ 293,406.93
$ 375,276.44
Less: Liabilities: mortgages and
notes payable
14,474.19
30,653.74
88,389.81
Reserve for
depreciation
82,234.11
99,191.48
100,548.22
Net Worth
161,155.83
163,561.71
186,338.41
Increase
15,558.55
2,405.88
22,776.70
Add:
nondeductible
personal expenses
13,500.00
15,000.00
15,000.00
Less:
nonrecognized
capital gain
(14,712.57)
Exemptions
(2,400.00)
(3,000.00)
(1,800.00)
Taxable income: Corrected
26,658.55
14,405.88
21,264.13
Reported
4,684.91
9,112.86
5,218.22
Unreported
21,973.64
5,293.02
16,045.91
ULTIMATE FINDINGS OF FACT Petitioners failed to maintain adequate books and records of their income and expenses. Petitioners intentionally failed to disclose amounts of taxable income to their accountants. Petitioners willfully omitted amounts of income from their returns for the years 1957 through 1964 with the intent to evade taxes thereon. All or part of the deficiency in each of the years 1957 through 1964 is due to fraud. OPINION Before proceeding to an analysis of the specific issues involved herein some general observations *270 are in order. Initially, we note that petitioners attempt to undermine respondent's net worth computations by pointing to a variety of alleged errors contained in the original deficiency notices. Many of the discrepancies between respondent's original position as to petitioners' net worth and that maintained at the trial were, to a large degree, attributable to the inadequacy of petitioners' records and their failure to furnish what information they had, not only during the course of preparing these cases for trial but even at the trial itself. When this aspect of the case is considered in conjunction with the facts that most of the elements of petitioners' net worth were ultimately stipulated by the parties and that we have not taken the doubtful items into account in determining the fraud issue (see p. 21, infra), we are satisfied that any infirmities have been overcome and that there is sufficient certainty to respondent's computations so as to enable us to proceed to decision in the normal fashion. Peter Mazzoni,T.C. Memo. 1970-37, affd. 451 F. 2d 197 (3d Cir. 1971). To a substantial extent, particularly as to the fraud issue, petitioners *271 maintain that they relied on their accountants to prepare their tax returns and that any discrepancies which may have occurred should not be attributed to them. Such a posture is based upon two contentions which we find unacceptable. The first contention is that petitioners supplied their accountants with all the necessary information. The second is that all of the information so furnished was in fact properly recorded and reported in petitioners' returns. Both of these contentions depend in the final analysis upon our evaluation of the credibility of the witnesses whom we heard and whose demeanor we observed. Clearly we are not obligated to accept every word of testimony at face value, particularly that of petitioner Ben Logan; it is within our province to determine the extent to which that testimony is believable. [3]Estate of Mercure v. Commissioner,448 F. 2d 922, 923 (6th Cir. 1971), affg. T.C. Memo. 1969-206; Michael Potson,22 T.C. 912, 928 (1954), affd. sub nom. Bodoglau v. Commissioner,230 F. 2d 336 (7th Cir. 1956); Peter Mazzoni,supra: The short answer to petitioners' contentions *272 is that -- given the generality and vagueness of the witnesses' testimony, the incompleteness of petitioners' books and records, and the availability of likely sources of unreported income via income from vending machines, rental properties, and interest on bank accounts -- we simply do not believe that all of petitioners' income was reported to their accountants or included in their tax returns. On the contrary, we are satisfied that a sizeable a7ount of such income was not so reported or included. There was evidence that petitioners failed to cooperate with respondent's agents. We recognize that this is often found to be a badge of fraud. However, in this case, it appears that such lack of cooperation took place at a point in time when there was a potential for criminal proceedings against petitioner *273 Ben H. Logan. Under these circumstances, reliance on this element may be open to question and accordingly we have not taken it into account in reaching our decision herein on the fraud issue. Cf. John Harper,54 T.C. 1121, 1141-1142 (1970). Against the foregoing background, we proceed to an analysis of particular items left open in the stipulation of the parties, including a delineation of those instances where the computations of the parties appear to be in error. We do so in light of the following calculations of taxable income: [4]
Notice of
Respondent's
Petitioner's
Amount
deficiency
brief
brief
reported
1955
$ 21,734.41
$ 11,020.13
$ 3,228.15
$ 5,101.56
1956
22,590.11
10,342.28
10,687.58
4,774.99
1957
26,616.82
46,799.70
14,651.48
0
1958
22,544.66
1 5,550.04
3,562.99
910.01
1959
22,282.67
11,492.50
5,577.57
(12,660.28)
1960
20,663.42
10,456.50
2,998.19
(12,1 44.56)
1961
29,408.17
16,998.11
3,365.27
1,706.38
1962
40,806.55
27,115.54
14,628.84
4,684.91
1963
34,600.47
15,866.39
10,993.85
9,112.86
1964
39,944.22
30,980.48
8,511.64
5,218.22
*274 1. Underlying Deficiencies
(a) Assets
The principal disputed asset in the net worth computation is the value of improvements made on the property at 355-7 W. 5th, known as Ben's Hotel. Although the stipulation recites that this property was acquired in 1952 and 1953, the record contains other indications that petitioners owned it as early as 1949; indeed both parties use that date to compute the reserve for depreciation. Accordingly, we have adopted the 1949 date in our findings. Respondent concedes that improvements costing $ 4,500 were made to the property in 1953. Petitioners introduced evidence of additional improvements. Although some of the evidence shows that the work done was in the nature of repairs rather than capital expenditures, the testimony of Arthur Farmer establishes that capital improvements were made at a cost of $ 17,000 (including the $ 4,500 conceded by respondent). Our findings of fact reflect the larger amount. Petitioners attempted to show that they owned restaurant furniture and fixtures in an amount different from that which was stipulated. A careful examination of the evidence convinces us that no departure from the stipulated figure *275 is justified. Aside from the major item of restaurant furniture and fixtures, various smaller amounts were stipulated or determined by respondent incorrectly. These adjustments are enumerated below in connection with the discussion of depreciation.
Petitioners question respondent's allocation of the cost basis of real property at 18-20 Calm between land and the building, which was destroyed by fire in 1959. Aside from the fact that this matter appears to be the subject of a stipulation, respondent's allocation is correct for the reasons mentioned below in connection with the discussion of depreciation. (b) Depreciation
Although the cost bases of virtually all assets are stipulated, the parties differ on such matters as salvage values, useful lives, and depreciation methods. As a consequence, the amount of petitioners' depreciation reserve as of each December 31 is not stipulated. It is therefore necessary for us to establish the parameters by which the correct amount of depreciation for each item may be determined in the Rule 155 computation. The discussion in this section of the opinion relates to the calculation of the underlying deficiencies, as to which petitioners *276 have the burden of proof. Rule 142(a), Rules of Practice and Procedure of this Court. A different situation obtains in connection with the fraud issue and is considered in the section of the opinion dealing with that issue. See pp. 20-25, infra. Although the computations annexed to their brief are unexplained, petitioners appear to contend that the stipulated purchase price of various business properties should be allocated between real property and equipment. The stipulation deals separately with business fixtures and equipment. Accordingly, we read the stipulated cost of each location as relating strictly to the cost of the realty. The parties also disagree as to the proper allocations of cost between land and buildings. In the absence of better evidence, we have made the allocations on the basis of relative appraised values determined by the city of Dayton. See Norman Baker Smith,51 T.C. 429, 441 (1968); 2554-58 Creston Corp.,40 T.C. 932, 940, n. 5 (1963). However, respondent's computation of depreciation on the 705 Eleanor property is in error; he deducted the value of the land twice in arriving at depreciable cost. Respondent also errs *277 in his manner of dealing with assets retired or disposed of. He computes the annual reserve for depreciation by adding the accumulated reserves with respect to each asset or class. In the year an asset is retired, he subtracts the accumulated reserve for that asset from the sum of the accumulated reserve for the other assets. This in effect amounts to a double reduction. The correct treatment is simply to omit the retired asset's accumulated reserve from the total. Petitioners properly elected a declining balance depreciation method only to the extent shown in our findings. Other property was not so depreciated in the year it was acquired (sec. 1.167(c)-1(c), Income Tax Regs.) or was shown elsewhere on the return as used property (sec. 167(c)). Additional first-year depreciation is similarly allowed only where a timely election was made. For the purpose of computing the deficiencies, we have accepted respondent's determination that, in accordance with the treatment reflected in petitioners' returns and in the absence of any contrary evidence, assets in the account labelled "restaurant fixtures and equipment" should be depreciated over a useful life of twenty years up to *278 the end of 1956, and over a ten year life thereafter. We have also determined that reductions in this account in 1962 and 1964 reflect the retirement of fully depreciated assets having a salvage value of zero. 2. Fraud
Respondent relies on his allegation of fraud both to sustain the additions to tax asserted under section 6653(b) and to defeat the petitioners' assertion of the bar of the statute of limitations. See footnote 2, supra. Respondent has the burden of proving fraud by clear and convincing evidence. Section 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; Foster v. Commissioner,487 F. 2d 902 (6th Cir. 1973), affg. per curiam T.C. Memo. 1972-188. Fraud will not be imputed or presumed and a mere suspicion is insufficient to sustain a finding of fraud. See, e.g., Carter v. Campbell,264 F. 2d 930, 935 (5th Cir. 1959). Nor should we infer unreported income merely from increases in net worth and then infer fraud from that unreported income, thereby piling inference upon inference. Peter Mazzoni,supra.On the other hand, a consistent failure to report income over the years, *279 including income reflected by increases in net worth, is evidence of fraud, if unexplained and sufficiently extensive. Lee v. United States,466 F. 2d 11 (5th Cir. 1972); Schwarzkopf v. Commissioner,246 F. 2d 731, 734 (3d Cir. 1957), affg. on this issue T.C. Memo. 1956-155; Peter Mazzoni,supra; cf. Adler v. Commissioner,422 F. 2d 63, 66 (6th Cir. 1970). On another occasion, we have exercised extreme care where respondent's proof of fraud was founded on proof of a pattern of understatements of net worth and our findings on the underlying deficiencies were based in part on the taxpayer's failure to carry his burden of proof. Peter Mazzoni,supra. We follow the same path herein and, as a consequence, hold, for purposes of the fraud issue, that respondent has not carried his burden of proof in respect of certain disputed items, namely, the useful lives of the restaurant fixtures and equipment in excess of ten years; any charges to the depreciation reserve on the retirements of restaurant fixtures and equipment; and useful lives, personal use, or cost adjustments to the *280 depreciation reserve in respect of automobiles and other tangible personal property. In the same vein, we have included the increased cost of $ 17,000 for capital improvements to Ben's Hotel. See pp. 16-17, supra. We also credited petitioners, in determining their reconstructed taxable income for purposes of the fraud issue, with allowable exemptions and standard deduction for each year (less the amount of stipulated itemized deductions where applicable, see p. 9, supra). Cf. footnote 4, supra. A net worth statement prepared on the basis of our findings, adjusted in accordance with the foregoing, shows that approximately the following amounts of taxable income were omitted from petitioners' returns: 1955
$ 1,900
1956
1,400
1957
45,500
1958
13,100
1959
20,800
1960
21,400
1961
12,400
1962
12,400
1963
5,500
1964
6,300
We conclude that these figures do indeed disclose a consistent pattern of omitted income, but one which began in 1957 rather than 1955. Given the inherent hazards of the net worth method as proof of fraud, Holland v. United States,348 U.S. 121 (1954), the blurring effect of the passage of twenty years *281 on some of such computations, and the disproportion between the apparent understatements in the initial years and those in later periods, we are unable to find that the existence of a pattern covering 1955 and 1956 has been proved with sufficient clarity. Respondent has not carried his burden for those two years. In subsequent years the picture is much more distinct. Beginning in 1957, petitioners consistently omitted large amounts of income from their returns. The smallest of these omissions is over one-half the reported amount in the year it occurred. This pattern by itself strongly suggests that the omissions were intentional, particularly since there are clearly indicated sources of unreported income, namely, vending machines, rental properties, and savings bank accounts. Lee v. United States,supra;Adler v. Commissioner,supra;Schwarzkopf v. Commissioner,supra.Many other circumstances suggest that petitioners concealed their true income: their failure to maintain adequate books and records; their personal control over the flow of information to their accountants; their practice of supplying much of that *282 information orally, without supporting records; and the failure to disclose separate items of income and assets on their returns. Our conclusion is buttressed by the following comparison of taxable income as disclosed on petitioners' returns with the stipulated amounts of nondeductible personal expenditures, [5] as reflected in the following table: 1955
$ 5,101.56
$ 7,849.69
1956
4,774.99
8,000.00
1957
0
9,500.00
1958
910.01
8,500.00
1959
(12,660.28)
11 ,500.00
1960
(12,144.56)
12,000.00
1961
1,706.38
13,500.00
1962
4,684.91
13,500.00
1963
9,112.86
15,000.00
1964
5,218.22
15,000.00
Petitioners' attempt to shift responsibility to their accountants is unavailing, for it rests on the discredited assumption that they supplied those employees with *283 adequate information. See pp. 13-14, supra. Indeed, we have found that some information was intentionally withheld. Nor are we persuaded that petitioner Ben H. Logan lacked financial sophistication. On the contrary, we are convinced that he was an astute businessman and was aware of the gross discrepancies between his reported income and the available funds evidenced by net worth increases and personal expenditures. Finally, petitioners' argument that the specific sources that respondent alleges provided the income omitted from their returns could not have produced the amount of deficiencies determined herein is insufficient for the purposes of this case, whatever relevance it might have in another context. Tully V. Foster,T.C. Memo. 1972-188, affd. per curiam 487 F. 2d 902 (6th Cir. 1973). Respondent need only prove by clear and convincing evidence that some amount of income was fraudulently omitted. Lee v. United States,supra.For the years 1957 through 1964, we hold that he has done so. Decisions will be entered under Rule 155. [6]
*284 Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. The amended answer in docket No. 3959-68 alleged that the deficiency notice for 1964 was issued within three years of the date the return was filed. The answer in docket No. 3657-72 alleged that section 6501(c)(2) was applicable to 1955 through 1963 and that section 6501(c)(3) was applicable to the year 1955. Respondent has not pursued these contentions and we deem them to have been abandoned.↩
1. The stipulation erroneously states that petitioners' 1963 return shows building improvements costing $ 8,024.31. The correct entries are: ↩
Building improvements
$ 6,117.45
Restaurant fixtures & equipment
948.87
Equipment
957.99
$ 8,024.31
1. Includes portion of value allocable to land, salvage, or personal use. ↩
2. Substituted basis. ↩
3. Determined on the basis of the remaining useful life of the buildings.↩
1. Includes amount allocable to business use.↩
3. In this connection we record that, although the transcript herein indicates that we received in evidence without qualification the record of proceedings in a criminal trial of petitioner Ben Logan for tax evasion, in point of fact we have confined our use of that record to evaluating the credibility of those witnesses who testified both at that trial and the proceedings herein.↩
4. For the purposes of this case, we have disregarded the above-the-line and below-the-line adjustment for deductible personal expenditures and/or the standard deductions, since they produce a "wash" in respect of underlying deficiencies and they have not affected our determination of the fraud issue. William G. Stratton,54 T.C. 1351 (1970). See p.22, infra.↩
5. The fact that the amounts of these expenditures were stipulated mitigates substantially the inaccuracy which might otherwise attach to their use. See Alfred B. Cenedella,T.C. Memo 1962-39↩. We also note the total absence in the record herein of any probative evidence of nontaxable sources of funds for these expenditures.
6. Our findings (and respondent's contentions on brief) show that petitioners understated their 1957 income in an amount greater than that determined in the notice of deficiency. Respondent has not sought an increased deficiency for that year in his pleadings. Decision will be entered in the amount shown in the statutory notice. Joe F. Watson,T.C. Memo. 1972-36↩.